UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SANDRA A. CAPEK,

        Plaintiff,

    -v-                                  No.  15-CV-4155-LTS-AJP

BNY MELLON, N.A.,

        Defendant.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

In this action brought against BNY Mellon, N.A. ("Defendant"), Sandra A. Capek ("Plaintiff") asserts six causes of action for employment discrimination and retaliation under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981), the New York State Human Rights Law, N.Y. Exec. Law § 296 <u>et seq.</u> (the "NYSHRL"), and the Administrative Code of the City of New York § 8-107 <u>et seq.</u> (the "City Law").  Plaintiff alleges that she was subjected to discriminatory adverse employment actions, including diminution in compensation, on account of her perceived religion.  (Am. Compl., Docket Entry No. 7.) Plaintiff also alleges that Defendant retaliated against her, through adverse personnel actions and business decisions, after she complained about such discrimination.  (<u>Id.</u>)  Defendant has moved for summary judgment on all counts.  (Docket Entry No. 76.)

The Court has subject matter jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367.

The Court has carefully considered all the submissions of both parties.  For the following reasons, Defendant's motion for summary judgment is granted in its entirety.

From 2006 through the present, Plaintiff has been employed as a sales manager in the Defendant's Wealth Management Division, with responsibility to obtain new business for Defendant.[2] A sales manager may cultivate new business on her own, receive a referral from a portfolio manager, or be assigned a lead by her supervisor, which may have been generated in response to Defendant's advertising activity or have otherwise come to the supervisor's attention. (Friend Tr. 280-81; Meister Tr. 38-39.) For each client, a sales manager will generally partner with one of Defendant's portfolio managers who perform the daily management of the client accounts. (Meister Tr. 30-31; Friend Tr. 80-81.) In addition to her base salary, Plaintiff received a commission on her sales. (Def. 56.1 St. ¶ 2.)

Revenue for each of Defendant's sales officers is tracked and collected, both nationally and regionally, in various weekly and yearly reports. (Def. 56.1 St. ¶¶ 4-5.) For 2013, Plaintiff had a goal for 2013 to generate a certain sum of new revenue, although the parties disagree as to whether Plaintiff or her supervisor, James Fagan, set this goal. (Pl. 56.1 St. ¶ 7.)

Plaintiff's ranking for 2012 fell to 29th out 40 nationwide sales officers. (Def. 56.1 St. ¶ 6.) In 2013, Plaintiff was ranked 49th out of 51 sales officers nationwide and last

---

[1]    The facts recited herein are undisputed unless otherwise indicated. Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions. The Court declines to consider facts raised by the parties that are either immaterial or constitute conclusory statements of law that the parties proffer as facts.

[2]    Plaintiff contests Defendant's assertion that her responsibility was primarily to attract new clients, contending that her responsibilities were to attract additional business through either new or existing clients. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Mem."), Docket Entry No. 87, at 5; Mem. In Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Docket Entry No. 90, at 31-32.)

among sales officers in the Tri-State Region.  (Id.)  In May of 2013, Fagan wrote in an email to his immediate superior, Katia Friend, and Friend's supervisor, Doris Meister, that Plaintiff was struggling to achieve satisfactory sales.  (Def. 56.1 St. ¶ 15, Def. Ex. N.)  On or about June 4, 2013, Plaintiff received her mid-year performance review which, despite Plaintiff's performance, did not indicate that any formal corrective action was imminent.  (Def. 56.1 St. ¶ 10; Pl. 56.1 St. ¶ 42; Fagan Tr. 113-14.)   Fagan and Plaintiff then prepared a "gap analysis" to help Plaintiff improve her performance.  (Def. 56.1 St. ¶ 13; Fagan Tr. 101-102.)  Fagan resigned, and Friend took over direct supervision of the sales managers, in October of 2013.  (Def. 56.1 St. ¶¶ 14, 16.)  Plaintiff ended the year with a fee credit,[3] a metric Defendant uses to measure sales activity, of less than one-half of her goal.  (Id. ¶ 17; Def. Ex. BB; see also Docket Entry No. 94 Ex. I, No. BNYME 2250.)

Targeting of Jewish Communities

Fagan had mistakenly come to believe that Plaintiff was Jewish.  (Capek Tr. 53-55.)  In March or April of 2013, after a Jewish portfolio manager (referred to as the "Portfolio Manager") transferred to the Garden City office from Manhattan, Fagan told Plaintiff to partner with the Portfolio Manager.  (Id. at 28, 30-33; Def. 56.1 St. ¶ 25.)  Although Plaintiff originally thought that this was a suggestion, Fagan clarified, during a subsequent meeting in May of 2013, that he wanted Plaintiff to work with the Portfolio Manager to cultivate business among the

---

[3]     Plaintiff does not dispute the cited fee credit, but notes that Defendant uses three metrics to measure sales productivity and the use of fee credit, though presumably not materially divergent from the other metrics, results in a lower dollar figure relative to other metrics, such as gross new business, and, therefore, casts Plaintiff in a less favorable light.  (Pl. 56.1 St. ¶ 17.)

Jewish community of Long Island's North Shore.[4]  (Id. at 36-37.)  Fagan elaborated that he

wanted them to hold prospect meetings in the Jewish community and "hold seminars in

temples."[5]  (Id. at 30, 35-37)  Plaintiff did not act on Fagan's plan to partner with the Portfolio

Manager or to cultivate the Jewish community.  (Def. 56.1 St. ¶ 26.)

Plaintiff's Discrimination Claim

While Fagan was under the impression that Plaintiff was Jewish, he received a

sales lead for a prospective client ("First Prospective Client"), who Plaintiff believed was not

Jewish.  (Capek Tr. 107, 111-12.)  Fagan maintains that he never knew of this first prospective

client's religious background, whereas Plaintiff states that he was known not to be Jewish.

(Fagan Tr. 169-70; Capek Tr. 111-12.)  Plaintiff's belief in this regard is based on the statement

of another person, whose identity she cannot recall, and the supposed fact that the attorney who

referred the client to Defendant was himself not Jewish, information she learned from another

conversation whose participants she cannot identify.[6]  (Capek Tr. 111-12.)  Fagan assigned this

lead to another sales manager in Garden City, rather than Plaintiff.  (Fagan Tr. 167.)  Despite

Plaintiff's assertions that she had more experience with fiduciary accounts, Fagan, according to

---

[4]    The parties dispute whether Fagan's statements to Plaintiff constituted a suggestion or
       directive to work with the Portfolio Manager to cultivate the Jewish community.  (See Pl.
       56.1 St. ¶ 36; Def.'s Mem at 11.)

[5]    Defendant explicitly notes in its opening papers that it accepts, for the purposes of the
       motion for summary judgment, the fact that Fagan told Plaintiff to engage the Jewish
       community as described above.  In its reply brief, however, Defendant denies the
       existence of a "Jewish strategy," as characterized by Plaintiff, and cites testimony of
       Fagan, Meister, and Friend that there was no strategy to specifically target Jewish people
       as prospective clients.  (Def.'s Mem. at 11; Pl. 56.1 St. ¶ 36; Def. Reply Mem. of Law in
       Supp. of its Mt. for Summ. J., Docket Entry No. 93, at 4-5 (citing Meister Tr. 290-91;
       Friend Tr. 177-78; Fagan Tr. 188-89).)

[6]    Plaintiff also ascribes her knowledge of this prospective client's religion to his wake after
       he subsequently passed away.  (Capek Tr. 111-12.)

his testimony, determined that the other sales manager would be a better fit and recalled that it may just have been his turn.  (Capek Tr. 109; Fagan Tr. 168-69.)

Over the summer of 2013, Fagan learned that Plaintiff was not Jewish.  (Def. 56.1 St. ¶ 28.)  After learning this, Fagan assigned Plaintiff a second sales lead for a second prospective client ("Second Prospective Client") on or about August 14, 2013.[7]  (Id. ¶ 12; Pl. 56 St. ¶ 28.) Before assigning this lead, Fagan inquired as to whether the Second Prospective Client was Jewish. (Fagan Tr. 129-131.)  Fagan, when asked at his deposition, stated that he wanted to know if this client was Jewish to help convince Plaintiff to work with the Portfolio Manager on this lead, noting that he tries to align people in terms of "common interests, common awareness, [and] common culture."  (Id.)

Plaintiff was assigned three other sales leads in 2013, including two prospective clients from Fagan and Meister's former firm (respectively the "Third" and "Fourth Prospective Clients"), one of whom was referred on or about June 4, 2013, and a lead from an advertisement which resulted in a new account believed to be the largest Defendant had ever secured from an advertisement in Plaintiff's region.  (Def. 56.1 St. ¶ 11; Def. Ex. Q; Pl. Ex. 63; Capek Tr. 110.) The parties do not place any of these three leads chronologically relative to Fagan's revelation that Plaintiff was not Jewish.  Plaintiff asserts that the Third and Fourth Prospective Clients were Jewish because Fagan and Meister's former firm had an established Jewish clientele, but fails to provide any competent evidence sufficient for the Court to infer their religion.  (Capek Tr. 68-9; Fagan Tr. 82-83.)

---

[7]       The parties disagree on whether Fagan learned Plaintiff was not Jewish in June, July, or August 2013, but do not dispute that it was before the lead for the Second Prospective Client was assigned to Plaintiff.  (Pl. 56.1 St. ¶ 28.)

Plaintiff's Retaliation Claim

In their papers, the parties identify two protected actions in response to the discrimination Plaintiff alleges she faced. (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Mem."), Docket Entry No. 87, at 17, 36.) First, in May of 2013, "Plaintiff expressed to Mr. Fagan her unwillingness to participate in the 'Jewish strategy' allegedly proposed by Mr. Fagan." (Def. 56.1 St. ¶ 31.) Second, on August 15, 2013, Plaintiff placed a confidential call to Defendant's ethics helpline to complain about Fagan's plan. (Id. ¶ 32.) She refused to reveal the name of any relevant party during this call. (Id. ¶ 32.) Plaintiff asserts that, in response to these protected acts, Defendant gave her an unjustifiably severe 2013 year-end review, issued her a formal warning letter, extended the effective period of the warning letter through March 6, 2015, and failed to act on a proposal, advocated by Plaintiff, to enlarge a strategic partnership agreement. (Mem. In Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Docket Entry No. 90, at 15-16, 27-28; see Pl. 56.1 St. ¶¶ 43-48.)

Plaintiff received her final year-end performance review on or about December 9, 2013. (Def. 56.1 St. ¶ 18.) Friend rated Plaintiff as unsatisfactory for achieving approximately 40% of her revenue goals. (Def. Ex. BB. at 2-3.) Friend wrote that Plaintiff was resistant to feedback and that, according to co-workers, she was difficult to work with. (Pl. 56.1 St. ¶ 44; Def. Ex. BB at 3-4.) When asked at her deposition to identify which of Plaintiff's co-workers she had spoken to about the experience of working with Plaintiff, Friend was not able to recall the specific content of the conversations and she was only able to definitively name one co-worker with whom she could recall having such a conversation. (Friend Tr. 161-65.) Plaintiff testified that Friend criticized her during the review meeting for failing to follow Fagan's instructions to cultivate the Jewish community. (Capek Tr. 64-66.)

On December 17, 2013, Friend issued an Initial Written Warning ("IWW"), which was a formal disciplinary warning, to Plaintiff.  (Def. 56.1 St. ¶ 20; Pl. Ex. 5 at 2.) According to Defendant's policy, IWWs are generally effective for one year.  (Pl. Ex. 5 at 2.) Although Defendant's disciplinary policy is progressive, escalating from informal measures to formal IWWs, Final Written Warnings ("FWW"), and finally termination, Defendant retains the right to accelerate the progression.  (Pl. Ex. 5 at 1-2.)  An IWW precludes an employee from applying for transfers, receiving promotions, and claiming eligibility for certain extra compensation.  (Pl. Ex. 5 at 2.)

The IWW mandated that Plaintiff take certain remedial actions within the following 60 days, including a requirement that she secure a certain sum in gross new business[8] by February 28, 2014.  (Def. 56.1 St. ¶ 20; Def. Ex. MM.)  The IWW, by its terms, was to remain in effect for one year.  (Def. Ex. MM.)

During the period from December 17, 2013, when the IWW was issued, through February 28, 2014, Plaintiff met the sum specified in her gross new business goal.  (Pl. 56.1 St. ¶ 45.)  The parties, however, differed on the timeframe during which the IWW required Plaintiff to meet her goal because the requirement was subject to two apparently inconsistent dates; the letter recited that all remedial actions were to be completed within 60 days but also stated that the requirement to raise a threshold amount of new business, included in the remedial actions section, was to be completed by February 28, 2014.  (Def. Ex. MM.)  Plaintiff observes that 60 days from the date the IWW was issued would have been February 15, 2014 and 60 days from the first day of 2014 would have been after February 28.  (Pl. Opp'n at 14.)  Plaintiff maintains

---

[8]     Gross new business is another metric used by Defendant to measure sales activity.  (Pl. 56.1 St. ¶ 17.)

that she was required to meet her revenue goal between December 17, 2013, when the IWW was issued, and February 28, 2014.  (Pl. Opp'n at 13-15; <u>see</u> Pl. Ex. 29.)  Defendant asserts that, to coincide with the start of the new year and new performance period, Plaintiff had to meet her revenue goal between January 1 and February 28, 2014, a period in which Plaintiff did not meet the prescribed goal.[9]  (Pl. Ex. 29; Friend Tr. 251-54; Def.'s Mem. at 21.)

After the disagreement as to the interpretation of the IWW, Plaintiff unsuccessfully appealed the IWW.  (Def. 56.1 St. ¶ 23.)  Defendant issued a revised IWW, dated March 6, 2014, and signed by Plaintiff on March 17, 2014, that required Plaintiff to secure a certain amount of new business per month for the remainder of the calendar year.  (Pl. Ex. 29; Pl. Ex. 74; Friend Tr. 261-62.)  Defendant characterizes this revision of the IWW as an accommodation in lieu of placing Plaintiff on a more severe FWW, a document which Defendant twice prepared but did not issue.  (<u>See</u> Pl. Ex. 5; <u>see</u> Pl. Ex. 29; <u>see also</u> Pl. Ex. 74; Pl. Ex. 53, Pl. Ex. 54, Pl. Ex. 71, Pl. Ex. 72; Friend Tr. 258, 261-62.)  The revised IWW resolved the ambiguity in the original IWW and afforded Plaintiff more time to show progress on her remedial goals. (<u>See</u> Pl. Ex. 5; <u>see</u> Pl. Ex. 29; <u>see also</u> Pl. Ex. 74; Friend Tr. 261-62.)  Plaintiff, however, characterizes the IWW revision as a punishment because the IWW's prohibition on promotion, transfer, and eligibility for certain compensation was extended through March 6, 2015, instead of ending on December 17, 2014, the expiration date of the original IWW.[10]  (<u>See</u> Pl. Ex. 5; Pl. Ex. 29; <u>see also</u> Friend Tr. 261-62.)

---

[9]     The parties disagree about the precise amount of revenue Plaintiff secured in the period between January 1, 2014 and February 28, 2014, but agree it is below the threshold set in the IWW. (Pl.'s Opp'n at 15 n.20.)

[10]    Plaintiff also points to the testimony of a Human Resources specialist who stated that she could not recall having ever seen an IWW extended. (De Santis Tr. 146-47.)

Plaintiff also asserts that Friend intentionally failed to advance a national strategic alliance with a third party (referred to as the "Prospective Partner"), constructively disapproving the relationship, in retaliation for Plaintiff's complaints. (Pl. 56.1 St. ¶ 48.) Such relationships encourage other companies to refer business to Defendant in exchange for a share of Defendant's management fees. (Meister Tr. 25.) Fagan had encouraged Plaintiff to develop a proposal to expand Defendant's existing but limited partnership with the Prospective Partner into a national alliance which could help increase Plaintiff's sales. (Pl. Ex. 17 at 5.) Fagan had encouraged Plaintiff to produce a due diligence submission that would be forwarded to Lee Woolley and then be presented to Larry Hughes for a final decision. (See Def. 56.1 St. ¶ 33; see also Pl. Ex. 20.) Plaintiff submitted the due diligence package to Friend in mid-October for sign off by Friend and Meister. (Docket Entry No. 92, Ex. I, Nos. PL000214, PL000227-28.) On October 10, 2013, Woolley received a version of the due diligence package, unsigned by Friend, from Capek. (Woolley Decl., Docket Entry No. 95, ¶¶ 11, 17; Capek Tr. 334.) On December 3, 2013, Friend sent an email to Woolley stating that she was "playing a little catch up" and asking if the Prospective Partner proposal was viable, to which Woolley responded that he thought it was. (Def. 56.1 St. ¶ 34; Def. Ex. OO.) On December 5, 2013, Woolley sent an email announcing that Hughes had selected several other firms. (Def. Ex. EE; Woolley Decl. ¶ 14.)

In an email from Woolley to Friend, dated December 5, 2013, Woolley wrote that, when Defendant considered the national alliance proposals, it could not increase the priority of the Prospective Partner proposal, relative to the other proposals, because Woolley was never able to present a completed due diligence submission to Hughes. (Pl. Ex. 44.) Defendant, however, proffers testimony from Woolley that the Prospective Partner was considered but not selected because of the low value of its assets under management, and because its association

with a large national firm with which Defendant wished to foster a relationship was less

developed than that national firm's relationship with other firms proposed for a national alliance.

(Woolley Decl. ¶¶ 7, 8, 9, 15, 19.)  Woolley further testified that the fact that Friend had not

signed the due diligence package did not factor into the final selection of national alliances, as he

could have secured any remaining signatures or other supporting documentation after selection.

(Id. ¶¶ 17, 19.)  Friend and Meister both testified that neither of them intentionally undermined

or sabotaged the Prospective Partner proposal.  (Friend Tr. 349-51; Meister Tr. 316-17.)


Procedural History: Motion to Dismiss

This Court previously denied Defendant's motion to dismiss Plaintiff's complaint,

holding that a person perceived to be a member of a protected class is protected by Section 1981.

Capek v. BNY Mellon, N.A., No. 15-CV-4155-LTS-AJP, 2016 WL 2993211, at *2-3 (S.D.N.Y.

May 23, 2016).  This Court also held that Plaintiff's allegation that she had been denied a sales

lead was sufficient to plausibly allege a materially adverse employment action because such a

denial could decrease her compensation, which was based partly on sales commissions.  Id. at

*3.  The Court noted that Plaintiff had not specifically alleged why she was entitled to the lead,

but found that such factual allegations were not necessary at the pleadings stage.  Id. at *3.


DISCUSSION

The pending motion is brought pursuant to Rule 56(a) of the Federal Rules of

Civil Procedure.  Under Rule 56(a), summary judgment is appropriate when the "movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  The moving party bears the burden of demonstrating the absence of a material

issue of fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986), and the court

must be able to find that, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting Heublein v. United States, 996 F. 2d 1455, 1461 (2d Cir. 1993)) (internal quotation marks omitted). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

McDonnell Douglas Burden Shifting

Claims for discriminatory employment practices and retaliation under Section 1981 and the NYSHRL are analyzed under the same McDonnell Douglas burden shifting framework as such claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973); Hicks, 593 F.3d at 163-64 (retaliation claims under the NYSHRL, Section 1981 and Title VII are analyzed under the McDonnell Douglas framework); Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) (analyzing Section 1981 and NYSHRL discrimination claims under the McDonnell Douglas paradigm).

Under this framework, Plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. "Plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). If Plaintiff makes out a prima facie case, the burden shifts to Defendant "to articulate

some legitimate, nondiscriminatory reason" for the adverse actions.  <u>McDonnell Douglas</u>, 411 U.S. at 802-803.  If Defendant meets this burden, Plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Defendant were not its true reasons but were a pretext for discrimination.  <u>Id.</u> at 804.  To establish pretext in connection with her religious discrimination claims under Section 1981 and the NYSHRL, Plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [Defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action.]'"  <u>Weinstock v. Columbia University</u>, 224 F.3d 33, 42 (2d Cir. 2000) (alteration in original) (citation omitted); <u>see</u> <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 447-48 (2d Cir. 1999) (citations omitted) (the central question on summary judgment in a Title VII case is whether, taking into account all of the circumstances, plaintiff has "presented sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of intentional discrimination.")

        To establish pretext for her retaliation claims, Plaintiff must demonstrate that, "but for" her undertaking protected conduct, she would not have experienced the challenged materially adverse employment actions, not simply that Defendant was motivated by the protected conduct.  <u>Univ. of Tex. Southwestern Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2532-33 (2013); <u>see</u> <u>also</u> <u>Richardson v. Bronx Leb. Hosp.</u>, No. 11-CV-9095-KPF, 2014 WL 4386731, at *16 (S.D.N.Y. Sep. 5, 2014).  "An employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false and that retaliation was the real reason . . . but a finding of falsity may, in appropriate circumstances, allow the factfinder to infer the ultimate fact of intentional retaliation."  <u>Vosburgh v. Am. Nat. Red Cross</u>, No. 5:08-CV-0653

LEK/TWD, 2014 WL 4826688, at *9 (N.D.N.Y. Sept. 29, 2014) (citations and emphasis

omitted). If multiple nondiscriminatory reasons are produced, pretext may only be inferred if the

multiple "nonretaliatory justifications . . . [are] not merely different, but inconsistent with one

another." Richardson, 2014 WL 4386731, at *16.


Discrimination Claims

      In order to establish discrimination under Section 1981 and the NYSHRL,

Plaintiff must demonstrate "1) that [s]he belonged to a protected class; 2) that [s]he was qualified

for the position [s]he held; 3) that [s]he suffered an adverse employment action; and 4) that the

adverse employment action occurred under circumstances giving rise to an inference of

discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). Because

Defendant does not dispute that Plaintiff was a member of a protected class, due to Fagan's

mistaken perception of her as Jewish, or that she was qualified for her position, the Court will

begin its analysis with the question of whether Plaintiff endured an adverse employment action.

An adverse employment action is a "materially adverse change in the terms and condition of

employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)

(internal quotation marks and citations omitted).

> To be materially adverse, a change in working conditions must be more disruptive
> than a mere inconvenience or an alteration of job responsibilities. Examples of
> such a change include termination of employment, a demotion evidenced by a
> decrease in wage or salary, a less distinguished title, a material loss of benefits,
> significantly diminished material responsibilities, or other indices unique to a
> particular situation.

Id. at 755 (citations, internal quotation marks, and alterations omitted).

      In connection with the motion to dismiss Plaintiff's complaint, this Court held

that Defendant's direction that Plaintiff cultivate Jewish clients was not a materially adverse

employment action.  <u>Capek</u>, 2016 WL 2993211, at *3.  The Court also held that the denial of the assignment of a sales lead to an employee who is compensated through commission could be materially adverse because it might affect an employee's income.[11]  <u>Id.</u> at *3.

Defendant argues that, in light of all evidence adduced about the distribution of leads, Plaintiff cannot establish that she has suffered a loss in income, and therefore cannot prove that she suffered an adverse employment action.   Defendant posits that the denial of leads for the First Prospective Client was offset by Defendant's assignment of leads for the Second, Third, and Fourth Prospective Clients in addition to the lead derived from Defendant's advertising campaign.

Courts have found the denial or reassignment of leads or accounts away from commission-compensated employees to be materially adverse when such sales leads were unequally distributed or an employee had some particular entitlement to the lead or account, such as having previously been assigned the lead or account or having made significant progress on cultivating a lead before its reassignment.  <u>Legrand v. N.Y. Rest. Sch./Educ. Mgmt. Corp.</u>, No. 02-CV-2249-PKC, 2004 WL 1555102, at *4-5 (S.D.N.Y. July 12, 2004) (finding that the unequal distribution of sales leads diminished plaintiffs' ability to meet sales targets which, in turn, affected eligibility for promotions and salary increases, and could be a materially adverse employment action); <u>Virola v. XO Commc'ns, Inc.</u>, No. 05-CV-5056-JG-RER, 2008 WL

---

[11]    Plaintiff argues that Fagan's instructions to cultivate Jewish business constituted a facially discriminatory policy that could "humiliate, exclude, and demean an employee" and is inherently materially adverse to a degree sufficient to sustain a discrimination claim.  (Pl.'s Opp'n at 26.)  This Court has already held, in addressing Defendant's motion to dismiss, that being "directed to cultivate Jewish clients and work with a Jewish Portfolio Manager [is] . . . insufficient, standing alone, to frame a material adverse action claim."  <u>Capek</u>, 2016 WL 2993211, at *3.  The Court declines to reconsider this conclusion.

1766601, at *17 (E.D.N.Y. Apr. 15, 2008) (stating that a jury could reasonably conclude that reassigning accounts from an employee compensated by commission to another employee was an adverse action); Flood v. UBS Global Asset Mgmt., Inc., No. 10-CV-374-RJH, 2012 WL 288041, at *11 (S.D.N.Y. Feb. 1 2012) (stating that the reassignment of a client from which a plaintiff had made significant progress in soliciting business could be materially adverse); Pouncy v. Danka Office Imaging, No. 06-CV-4777-RPP, 2009 U.S. Dist. LEXIS 44752, at *19-21 (S.D.N.Y. May 19, 2009) (finding that removing commission-producing accounts and sales territories from an employee was an adverse employment action). Consistent with the foregoing decisions, this Court concludes that, to establish a materially adverse employment action on the basis of a denial of a lead, a commission-compensated plaintiff must establish that there was an unequal distribution of lucrative leads or that she had a basis for entitlement to that particular lead. See Capek, 2016 WL 2993211, at *3 (observing that Plaintiff had not demonstrated an entitlement to a lead assigned to another sales manager, but that such a showing was not required at the pleadings stage). To hold otherwise would be to permit Plaintiff to claim an adverse employment action simply because Defendant did not assign her every potential lead.

Here, Plaintiff has not proffered evidence sufficient to permit a jury to find that Defendant distributed leads unequally. The record before the Court shows that Plaintiff was assigned four leads, compared to only a single lead that was assigned to another sales manager. Moreover, Plaintiff's testimony about her purported experience in fiduciary accounts like that of the First Prospective Client is insufficient to permit a jury to conclude she had an entitlement to any leads or accounts.[12]

---

[12]     Because the Court finds that Plaintiff has not produced evidence sufficient for a jury to find that she suffered an adverse employment action, the Court does not reach

Accordingly, the Court finds that there is no genuine issue of fact as to whether Plaintiff suffered an adverse employment action as a result of Defendant's perception that she was Jewish, and Defendant is entitled as a matter of law to summary judgment dismissing Counts One and Two of the Amended Complaint.

Retaliation Claims

In order to establish a retaliation claim under Section 1981 and the NYSHRL, Plaintiff "must show (1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." Gorzynski v. JetBlue Airways Corp., 596 F.3d 96, 110 (2d Cir. 2010). Defendant does not dispute that the complaints to Fagan and the ethics helpline were protected activities of which Defendant was aware or that the four actions alleged by Plaintiff were adverse employment actions under the broader definition of that term used in connection with retaliation claims. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67-70 (2006) (for purposes of retaliation claims, an adverse action is one that would dissuade a reasonable employee from making a charge of discrimination). The Court, therefore, examines Defendant's argument that Plaintiff cannot demonstrate that there was a causal connection between the protected acts and the adverse employment actions.

For the purposes of a retaliation claim, a causal connection can be established directly by presenting facts demonstrating retaliatory animus, or indirectly through evidence of disparate treatment connected with the protected activity or through temporal proximity between the protected activity and the adverse retaliatory action. Hicks, 593 F.3d at 170 (quoting Gordon

---

Defendant's argument that the circumstances do not give rise to an inference of discrimination.

v. N.Y. City Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  Defendant argues that, when

causation is evidenced exclusively by temporal proximity, the protected act and adverse

retaliatory act must occur "very close" to each other.  See Clark Cty. Sch. Dist. v. Breeden, 532

U.S. 268, 273-74 (2001).  Defendant observes that, although the Second Circuit

> has not drawn a bright line to define the outer limits beyond which a temporal
> relationship is too attenuated to establish a causal relationship[,] . . . courts in this
> Circuit have consistently held that a passage of more than two months between
> the protected activity and the adverse employment action does not allow for an
> inference of causation.

Moccio v. Cornell Univ., 889 F. Supp. 2d 539, 578-88 (S.D.N.Y. 2012), aff'd, 526 F. App'x 124

(2d Cir. 2013) (quoting Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252

F.3d 545, 554 (2d Cir. 2001) and Flood, 2012 WL 288041, at *17) (citations and internal

quotation marks omitted).

Courts evaluate temporal proximity on a case-by-case basis and, in appropriate

cases, may find sufficient proximity beyond the customary two-month intervening period when

the record includes other evidence of causation, such as when a defendant takes other negative

actions shortly following the protected activity.  See Quinby v. WestLB AG, No. 04-CV-7406-

WHP, 2007 WL 1153994, at *13 (Apr. 19, 2007 S.D.N.Y. 2007) (an eight-month passage of

time between a protected act and termination could establish causation when a poor performance

review was issued soon after the protected act); see also Vega v. Hempstead Union Free Sch.

Dist., 801 F.3d 72, 92 (2d Cir. 2015) (finding sufficient temporal connection where allegedly

retaliatory reassignment of teacher's classes occurred shortly after EEOC Complaint was filed

and allegedly retaliatory change of curriculum was made within three months of the filing of the

charge).

Furthermore, as argued by Plaintiff, "courts within this Circuit have been willing to look past a significant passage of time when the defendant took advantage of the first available opportunity to retaliate."  See Silverio v. United Block Ass'n, Inc., No. 13-CV-5001-AJN, 2015 WL 221151, at *8 (S.D.N.Y. Jan. 14, 2015); see also Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (causation found despite a delay of eight months between a protected act and retaliatory act because defendant could not have acted until plaintiff returned from his eight-month job assignment); Quinby, 2007 WL 1153994, at *13 (jury could find temporal proximity where defendant acted at the first opportunity to deny the plaintiff's annual bonus if the defendant made such a denial at the time when such bonuses were normally awarded).  Here, Plaintiff called the ethics helpline, her latest protected act, on August 15, 2013.  The Court therefore examines the timing of each alleged retaliatory act, and whether the act represented the first opportunity to engage in such conduct following Plaintiff's discrimination complaints.

Defendant's first opportunity to issue Plaintiff her year-end review was not until close to the end of the year and, accordingly, Plaintiff has made a de minimis showing of temporal proximity as to that retaliatory action.  Because Defendant is empowered to issue an IWW at any time, the approximately four-month passage of time is between the complaint and the IWW is too attenuated to support a reasonable inference of causation. The revised IWW resolved the ambiguity inherent in the original IWW and was, therefore, derivative of the initial warning.  Because the original IWW was too attenuated from the protected conduct to suggest causation, the revised IWW, which was derived from and issued after the original is, by extension, also too attenuated from the protected conduct to support an inference of causation based on temporal proximity.

Plaintiff argues that, notwithstanding the testimony of Friend and Meister to the contrary, Friend constructively denied the Prospective Partner alliance by intentionally not signing and forwarding the due diligence material she received in order to ensure that the proposal would not be approved. Drawing all reasonable inferences in favor of the non-moving Plaintiff, a reasonable jury could find that Friend's conduct in not acting on the due diligence submission as soon as she received it in mid-October, approximately two months after Plaintiff called the ethics helpline, was retaliatory. This time period is consistent with the two-month window in which courts normally permit an inference of causation. Ruhling v. Tribune Co., No. 04-CV-2430-ARL, 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) ("two months between a protected activity and an adverse employment action seems to be the dividing line"). Plaintiff has, therefore, made a prima facie case for the denial of the Potential Partner alliance and the issuance of the year-end review as adverse employment actions.

The burden thus shifts to Defendant to articulate a non-discriminatory reason for the two remaining adverse actions. McDonnell Douglas, 411 U.S. at 802-803. Here, Defendant points to evidence that Friend, "playing catch up," was still communicating with Woolley in December to promote Plaintiff's national alliance proposal. Defendant also proffers that it chose not to enter an alliance with the Prospective Partner because of its low value of assets under management compared to the other alliances Defendant approved. Defendant asserts that the negative year-end review was warranted by Plaintiff's low sales productivity and her failure to meet her goal. As Defendant has articulated legitimate and non-discriminatory reasons for the two remaining actions, the burden returns to Plaintiff to establish that these reasons were pretextual by showing that the explanations offered by Defendant were false and that retaliation was the "but for" cause Defendant's actions. Vosburgh, 2014 WL 4826688, at *9 ("An

employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false and that retaliation was the real reason.") (alterations omitted); see also Nassar, 133 S. Ct. at 2532-33 (requiring Plaintiff demonstrate that action would not have been taken but for retaliatory animus).  The Second Circuit has held that temporal proximity alone is insufficient to demonstrate pretext.  Kwan v. Andalex Grp., LLC, 737 F.3d 834, 847 (2d Cir. 2013).

        Plaintiff does not explicitly argue that her poor revenue production was a pretext for the negative review.  Plaintiff does, however, argue that the observations in the review that Plaintiff was difficult to work with amounted to veiled references to Plaintiff's resistance to Fagan's instructions to cultivate Jewish clients.  (Pl.'s Opp'n at 9, 36.)  Plaintiff cites as evidence of pretext Friend's comments at the meeting and Friend's inability, at her deposition, to identify more than one of the co-workers who observed Plaintiff was difficult to work with.  (Id.) Plaintiff also cites her own testimony that, in their conversation about the review, Friend discussed Plaintiff's failure to cultivate North Shore communities as directed.  Even if the Court were to accept the inference that Friend issued a poor review because Plaintiff failed to cultivate Jewish clients, Plaintiff does not meet her burden of demonstrating that, given Plaintiff's failure to meet her goals, Defendant's articulated rationale was pretextual.  A reasonable jury could not find that, "but for" the protected activity (Plaintiff's August 2013 complaint), Plaintiff would have received a positive review in spite of her poor production.  See Nassar, 133 S. Ct. at 2532-33.  Indeed, even if Plaintiff's resistance to cultivating Jewish business was a motivating factor for the negative review, discipline for not following directions is in no way incompatible with discipline for poor sales.  Cf. Kwan, 737 F.3d at 846-47 (2d Cir. 2013) (finding genuine issues of material fact when employer's proffered reasons for terminating employee directly contradicted

each other); see also Richardson, 2014 WL 4386731, at *16-18 ("a defendant's nonretaliatory justifications must be not merely different, but inconsistent with one another").

Plaintiff argues that Friend's initial enthusiasm for Plaintiff's national partnership proposal, followed by her failure to forward a complete and signed due diligence package to Woolley after her ethics complaint, supports an inference that Friend purposely sabotaged the proposal in retaliation for Plaintiff's protected activities. Temporal proximity alone is insufficient to overcome Defendant's legitimate explanation and Plaintiff's theory that Friend purposefully failed to forward a complete proposal is not otherwise supported by the record. El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) (stating that temporal proximity may be sufficient to carry a prima facie case but, alone, is not sufficient to prevail at the pretext stage of a retaliation analysis). In seeking to rebut Friend's electronic communications indicating that her failure to complete, sign, and forward the due diligence package was inadvertent and asking Woolley if the proposal was still viable, Plaintiff offers nothing more than evidence of temporal proximity and speculation as to Friend's motives.[13] See id.; see also Zapata v. Riverside Study Ctr., Inc., No. 10 CIV. 6283 CM, 2012 WL 1744792, at *12 (S.D.N.Y. May 16, 2012) (finding that non-moving plaintiff's assertion that employees of defendant company could have supervised premises, despite testimony that defendant company did not supervise the work on that project, amounted to merely colorable speculation and thus insufficient to avoid summary judgment).

---

[13]    The record also contains evidence to support the contradictory conclusions that Woolley did not present Plaintiff's proposal because it was not complete and that Defendant bank had considered the proposal and declined it. These explanations are, however, immaterial because they neither implicate Friend's motivation for failing to promptly complete and forward the proposal nor undermine the veracity of her explanation for her failure to do so.

CAPEK MSJ

Accordingly, the Court grants summary judgment dismissing Plaintiff's federal and state causes of action for retaliation.

City Law Claims

Having dismissed all Plaintiff's federal and state law claims, the Court declines to exercise supplemental jurisdiction of Plaintiff's City Law claims. 28 U.S.C. § 1367(c); See Lerner v. Fleet Bank, N.A., 318 F.3d 113, 130 (2d Cir. 2003) ("In most circumstances, a district court should decline supplemental jurisdiction if all federal claims have been dismissed at the pleading stage.").

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment and close this case. This Memorandum Opinion and Order resolves Docket Entry No. 76.

SO ORDERED.

Dated: New York, New York
March 15, 2018

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge